Slip Op. 17-22

# UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| BMW OF NORTH AMERICA LLC, | |
| Plaintiff, | |
| v. | Before: Jennifer Choe-Groves, Judge |
| UNITED STATES, | Court No. 15-00052 |
| Defendant, | |
| and | |
| THE TIMKEN COMPANY, | |
| Defendant-Intervenor. | |

## OPINION AND ORDER

[Sustaining in part and remanding in part the U.S. Department of Commerce's final determination in the 2010–2011 administrative review of the antidumping duty order on ball bearings and parts thereof from the United Kingdom.]

Dated: March 2, 2017

Max F. Schutzman, Grunfeld Desiderio Lebowitz Silverman & Klestadt, LLP, of New York, NY and Washington, DC, argued for Plaintiff BMW of North America LLC. With him on the brief was Kavita Mohan.

Tara Kathleen Hogan, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, argued for Defendant United States. With her on the brief were Benjamin C. Mizer, Principal Deputy Assistant Attorney General, Jeanne E. Davidson, Director, and Claudia Burke, Assistant Director. Of counsel on the brief was Jessica Marie Link, Office of the Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce, of Washington, DC.

Geert M. De Prest, Stewart and Stewart, of Washington, DC, argued for Defendant-Intervenor The Timken Company. With him on the brief was Terence Patrick Stewart.

Choe-Groves, Judge: This matter is before the court on a Rule 56.2 motion for judgment on the agency record filed by Plaintiff BMW of North America ("Plaintiff" or "BMW"). See Pl.'s Rule 56.2 Mot. J. Upon Agency R., Sept. 18, 2015, ECF No. 29 ("Pl.'s Mem. Supp."). Plaintiff brings this action pursuant to 28 U.S.C. § 1581(c) (2012)[1] for judicial review of decisions made by the U.S. Department of Commerce ("Commerce" or "Department") during the administrative review of the antidumping order on ball bearings and parts thereof from the United Kingdom. See Compl. Feb. 27, 2016, ECF No. 7; See Ball Bearings and Parts Thereof From Japan and the United Kingdom, 80 Fed. Reg. 4,248 (Dep't Commerce Jan. 27, 2015) (final results for administrative review 2010-2011), as amended, 80 Fed. Reg. 9,694 (Dep't Commerce February 24, 2015) (amended final results for administrative review 2010-2011) (collectively, "Final Results")[2] and accompanying Issues & Decision Memorandum for the Antidumping Duty Administrative Review of Ball Bearings and Parts Thereof from the United Kingdom; 2010–2011, A-412-801, (Jan. 22, 2015), available at http://enforcement.trade.gov/frn/summary/multiple/2015-01481-1.pdf (last visited Feb. 22, 2017) ("I&D Memo"). For the reasons set forth below, the court upholds Commerce's determination to resume the administrative review and apply an adverse inference in selecting from facts otherwise available against Plaintiff, but remands for redetermination Commerce's decision to assign Plaintiff a 254.25 percent dumping margin.

---

[1] All citations to Title 28 of the U.S. Code are to the 2012 edition.

[2] Commerce simultaneously conducted the 2010–2011 administrative reviews of the two separate antidumping orders on ball bearings and parts thereof from Japan and the United Kingdom. See Final Results. This action, however, only concerns Commerce's determinations in the administrative review of the antidumping duty order on merchandise from the United Kingdom.

**BACKGROUND**

Commerce issued an antidumping order on ball bearings and parts thereof from the United Kingdom on May 15, 1989. See Ball Bearings, and Cylindrical Roller Bearings and Parts Thereof From the United Kingdom, 54 Fed. Reg. 20,910 (Dep't Commerce May 15, 1989) (antidumping duty orders and amendments to the final determinations of sales at less than fair value) ("Order"). Commerce and the U.S. International Trade Commission ("ITC") instituted the second sunset review of the Order in 2005. See Initiation of Five-year ("Sunset") Reviews, 70 Fed. Reg. 31,423, 31,423 (Dep't Commerce June 1, 2005); Certain Bearings From China, France, Germany, Italy, Japan, Singapore, and the United Kingdom, 70 Fed. Reg. 31,531, 31,532 (ITC Jun. 1, 2005) (institution of five-year reviews). The ITC determined that revocation of the Order would lead to continuation or recurrence of material injury to the domestic industry and various parties challenged the decision at the U.S. Court of International Trade ("CIT"). See Certain Bearings From China, France, Germany, Italy, Japan, Singapore, and the United Kingdom, 71 Fed. Reg. 51,850 (ITC Aug. 31, 2006) (final results determination in five-year reviews); NSK Corp. v. United States, 35 CIT ___, 774 F. Supp. 2d. 1296 (2011).

While the ITC's injury determination was on appeal, Commerce published a notice of opportunity to request administrative review of the Order for entries of the subject merchandise from May 1, 2010–April 30, 2011. See Antidumping or Countervailing Duty Order, Finding, or Suspended Investigation, 76 Fed. Reg. 24,460 (Dep't Commerce May 2, 2011) (opportunity to request administrative review). Plaintiff filed a request for an administrative review of the Order on May 31, 2011. See BMW's Request for Administrative Review of the Antidumping Duty Order on Ball Bearings and Parts Thereof From The United Kingdom, PD 3, Doc. No. 4977

(May 31, 2011). Commerce published its notice of initiation of the administrative review on June 28, 2011. See Initiation of Antidumping and Countervailing Duty Administrative Reviews and Request for Revocation in Part, 76 Fed. Reg. 37,781 (Dep't Commerce Jun. 28, 2011) ("Notice of Initiation").

Pursuant to the CIT's decision in NSK Corp. v. United States, 35 C.I.T. __, 774 F. Supp. 2d 1296 (2011), Commerce published a notice on July 15, 2011 announcing that: 1) the Order was revoked; 2) all ongoing administrative reviews were "discontinued," 3) the collection of cash deposits was "discontinued," and 4) liquidation was suspended for unliquidated entries of ball bearings entered or withdrawn from a warehouse between July 11, 2005 through April 30, 2011, until a final and conclusive court decision. See Ball Bearings and Parts Thereof From Japan and the United Kingdom, 76 Fed. Reg. 41,761 (Dep't Commerce Jul. 15, 2011) (revocation of antidumping duty orders) ("Revocation Notice"). The Court of Appeals for the Federal Circuit reversed the CIT decision in NSK Corp. and ordered the CIT to reinstate the ITC's affirmative injury determination. See NSK Corp. v. U.S. Intern. Trade Com'n, 716 F.2d 1352 (Fed. Cir. 2013). The CIT then reinstated the ITC's affirmative injury determination in a final judgment. See NSK Corp. v. U.S. Intern. Trade Com'n, Slip Op. 13-143 (November 18, 2013).

Following the reinstatement of the ITC's determination, Commerce published a notice that reinstated the Order and resumed all discontinued administrative reviews, including the 2010 – 2011 period of review. Ball Bearings and Parts Thereof From Japan and the United Kingdom, 78 Fed. Reg. 76,104 (Dep't Commerce Dec. 16, 2013) (notice of reinstatement of antidumping duty order, resumption of administrative reviews, and advance notification of sunset reviews)

("Reinstatement Notice"). Commerce stated that it intended to issue preliminary results no later than 245 days after the publication of the Reinstatement Notice and that the deadline for withdrawing any review requests would be 90 days after the date of the publication of the Reinstatement Notice. Id. at 76,105–06. Prior to publication of the Reinstatement Notice, Commerce sent an email on December 12, 2013 to counsel for parties subject to the review, which indicated that a Quantity and Value ("Q&V") questionnaire would be forthcoming. See U.S. Department of Commerce Memo to File Regarding E-mail Sent to BMW's Counsel Forwarding the Quantity and Value Questionnaire, PD 65, bar code 3229044-01 (Sept. 17, 2014) ("E-mail to Counsel"). The Department sent Q&V questionnaires to all interested parties and requested their responses by January 6, 2014.[3] See U.S. Department of Commerce Quantity and Value Questionnaire, PD 6, bar code 3167852-01 (Dec. 12, 2013); U.S. Department of Commerce Letter to Interested Parties Granting Extension of Time to File Quantity and Value Questionnaire Responses, PD 9, bar code 3169160-01 (Dec. 20, 2013). In the Q&V questionnaire cover letter, Commerce reminded the parties that, as a consequence of failing to respond with the requested information, the Department "may find that [the party] failed to cooperate by not acting to the best of [the party's] ability to comply with the request for information, and may use an inference that is adverse to [the party's] interests in selecting from the facts otherwise available, in accordance with [19 U.S.C. § 1677e (2012)[4]]." Id. at 2. BMW neither sent a Q&V questionnaire response to Commerce, nor withdrew its request for a review.

---

[3] The original deadline for Q&V responses was scheduled for December 26, 2013, however, after a request for an extension of time, Commerce extended the deadline to January 6, 2014.

[4] All citations to Tariff Act of 1930, as amended, are to the relevant provisions of Title 19 of the U.S. Code, 2012 edition.

See Decision Memorandum for Preliminary Results of Antidumping Duty Administrative Reviews: Ball Bearings and Parts Thereof From Japan and the United Kingdom; 2010-2011 at 5, A-412-801, (Sept. 17, 2014), available at http://enforcement.trade.gov/frn/summary/multiple/2014-22628-1.pdf (last visited Feb. 22, 2017) ("Preliminary Results Memo").

The Department selected NSK Europe Ltd. and NSK Bearings Europe Ltd. (collectively, "NSK") as the sole mandatory respondent. See Ball Bearings and Parts Thereof From Japan and the United Kingdom, 79 Fed. Reg. 56,771, 56,772 (Dep't Commerce Sept. 23, 2014) (preliminary results of the administrative review, 2010-2011) ("Preliminary Results"). In the preliminary results, Commerce determined that Plaintiff had not cooperated to the best of its ability in responding to the Q&V questionnaire. See id. Commerce applied an adverse inference in selecting from facts otherwise available ("AFA") and assigned Plaintiff a dumping margin of 254.25 percent, selected from the petition. See id.; Preliminary Results Memo at 7. BMW subsequently filed a case brief challenging this determination. See BMW's United Kingdom Case Brief, PD 70, bar code 3237084-01 (Oct. 23, 2014) ("BMW's Case Brief"). On January 27, 2015, the Department published its final results and assigned Plaintiff a dumping margin of 254.25 percent. See Final Results, 80 Fed. Reg. at 4,249. Plaintiff subsequently brought this action challenging Commerce's resumption of the administrative review, determination to apply AFA, and selection of the petition rate in applying AFA. See Compl. ¶¶ 19–24.

**JURISDICTION AND STANDARD OF REVIEW**

The court has jurisdiction over an action challenging the final determination in an administrative review of an antidumping duty order. See 19 U.S.C. § 1516a(a)(2)(B)(iii) and 28 U.S.C. § 1581(c). The court will uphold Commerce's determinations, findings, or conclusions

unless they are unsupported by substantial evidence on the record or otherwise not in accordance with the law. 19 U.S.C. § 1516a(b)(1)(B)(i).

## DISCUSSION

Plaintiff asserts that Commerce (1) did not have the authority to resume a discontinued administrative review, (2) should not have applied an adverse inference in calculating the dumping margin, and (3) should not have selected the petition rate of 254.25 percent as the rate calculated using an adverse inference. See Pl.'s Mem. Supp. 10–33.

## I. Resuming the Administrative Review

Plaintiff argues that Commerce's resumption of the administrative review was not in accordance with the law because Commerce resumed the review after a two-year hiatus, rather than initiating a new review. See Pl.'s Mem. Supp. 10–15. Plaintiff notes that there are no cases in which Commerce has automatically resumed a review after an antidumping order was revoked and subsequently reinstated following a court decision. See id. at 13. The court must determine if Commerce's actions in this case were consistent with its statutory obligations and thereby in accordance with the law.

The antidumping statute addresses Commerce's responsibility to conduct administrative reviews and requires in relevant part:

> At least once during each 12-month period beginning on the anniversary of the date of publication of . . . an antidumping duty order under this subtitle . . . the administering authority, if a request for such a review has been received and after publication of notice of such review in the Federal Register, shall —
>
> (A) review and determine the amount of any net countervailable subsidy,
> (B) review, and determine (in accordance with paragraph (2)), the amount of any antidumping duty, and

Case 1:15-cv-00052-JCG   Document 74   Filed 03/13/17   Page 8 of 18

Court No. 15-00052                                                                                                    Page 8

> (C) review the current status of, and compliance with, any agreement by reason of which an investigation was suspended, and review the amount of any net countervailable subsidy or dumping margin involved in the agreement,

and shall publish in the Federal Register the results of such review, together with notice of any duty to be assessed, estimated duty to be deposited, or investigation to be resumed.

19 U.S.C. § 1675(a)(1). Congress imposed this duty on the Department to conduct an administrative review after receiving a request for a review and Commerce has issued additional regulatory guidance detailing procedures for conducting administrative reviews. See, e.g., 19 C.F.R. § 351.213 (outlining rules for review requests and conduct during reviews); 19 C.F.R. § 351.221 (discussing administrative review procedures). The Department must first publish a notice informing the public that Commerce received a request and that it will initiate a review. See 19 U.S.C. § 1675(a)(1); 19 C.F.R. § 351.221(b). Commerce must publish the preliminary results detailing the preliminary determinations and the final results that include the final calculated rates. See id. For the court to uphold Commerce's determination in this instance, Commerce's actions must comport with its statutory and regulatory obligations. For the reasons set forth below, the court finds that the Department has acted in accordance with the law.

Congress instructed that Commerce must conduct a review when it receives a request. In this case, the Department took steps to administer a review consistent with its statutory obligations and its own regulations. Commerce initiated the review in May 2011 after it received a request for review from several parties, including Plaintiff. See Notice of Initiation, 76 Fed. Reg. at 37,782. Commerce published a notice in the Federal Register in July 2011 informing the public that it had received a request and that it was initiating a review. See id. Following the

resumption of the review, the Department published its preliminary determinations in the Federal Register in September 2014. See Preliminary Results, 79 Fed. Reg. at 56,772–73. The Department published its final results in January 2015, which detailed the final calculated dumping rates for the review period consistent with both statute and regulations. See Final Results, 80 Fed. Reg. at 4,249–50. Commerce's actions complied with its statutory obligations that were triggered when it received the request for review.

When Commerce resumed the administrative review, it sent an email to counsel from the initial review (including Plaintiff's counsel) to inform them that a Q&V questionnaire was forthcoming, published a Federal Register notice that it was resuming the "discontinued" reviews, and posted the Q&V questionnaire on the ACCESS website. See E-mail to Counsel; Reinstatement Notice, 78 Fed. Reg. at 76,105. Commerce also extended the opportunity to all parties to withdraw their previous requests for review. See Reinstatement Notice, 78 Fed. Reg. at 76,105–06. All parties chose to withdraw their requests, except for Plaintiff. See Preliminary Results Memo. The Department's actions support the court's conclusion that the Department acted in accordance with the law after it received a request for review.

Plaintiff argues that the Revocation Notice not only revoked the Order but quashed any pending administrative reviews related to the Order. See Pl.'s Mem. Supp. 12. Plaintiff has failed, however, to cite any direct authority for this proposition and the argument is inconsistent with language in the Revocation Notice. Commerce instructed U.S. Customs and Border Protection in the Revocation Notice to suspend liquidation with regard to entries subject to the Order pending a "final and conclusive" court decision. See Revocation Notice, 76 Fed. Reg. at 41,763. Commerce thus acknowledged the ongoing legal action and recognized that the Order

could be reinstated at a later date. Because the CIT decision prompting the revocation was challenged on appeal, the revocation could not be definitive until there was a "final and conclusive" court decision. See Timken Co. v. United States, 893 F.2d 337, 339–41 (Fed. Cir. 1990); Hosiden Corp. v. Advanced Display Mfrs. of Am., 85 F.3d 589, 590–91 (Fed. Cir. 1996).

The administrative review in this case was linked directly to the validity of the underlying antidumping order. See 19 U.S.C. § 1675(a) (directing Commerce to review antidumping duty orders periodically upon a timely request). Because the underlying order survived revocation pending a "final and conclusive" court decision, the attendant administrative review in this case survived revocation. Moreover, because BMW had the opportunity to withdraw its request for review but did not do so, the administrative review process was essentially started anew by Commerce when it was resumed. The statute permitted Commerce to resume the administrative review without having to initiate a new review.

Viewing the totality of Commerce's actions, the court finds that the Department's resumption of the 2010–2011 administrative review was consistent with the administrative review statute and Commerce's regulations. Therefore, Commerce acted in accordance with the law.

## II. Application of AFA

Plaintiff argues that Commerce's use of AFA was not supported by substantial evidence. See Pl.'s Mem. Supp. 15–27. Plaintiff asserts that there was no rational relationship between the purpose of the AFA statute and the imposition of an AFA rate against Plaintiff in this case. See id. at 18. Plaintiff contends that Commerce should have contacted Plaintiff's counsel after it discovered that Plaintiff did not file a Q&V questionnaire response. See id. at 20–21.

Commerce shall use the facts otherwise available in reaching the applicable determination when it finds that an interested party withholds information that has been requested, fails to provide such information by the deadlines for submission, or significantly impedes a proceeding or provides information that cannot be verified. See 19 U.S.C. § 1677e(a). If Commerce "finds that an interested party has failed to cooperate by not acting to the best of its ability to comply with a request for information," the Department "may use an inference that is adverse to the interests of that party in selecting from among the facts otherwise available." 19 U.S.C. § 1677e(b).

The Court of Appeals for the Federal Circuit has explained that in determining if a respondent complied to the "best of its ability," Commerce must assess whether a respondent has "put forth its maximum effort to provide Commerce with full and complete answers to all inquiries . . . [and], [w]hile the standard does not require perfection and recognizes that mistakes sometimes occur, it does not condone inattentiveness, carelessness, or inadequate record keeping." Nippon Steel Corp. v. United States, 337 F.3d 1373, 1382 (Fed. Cir. 2003). Here, Plaintiff failed to provide any information requested by Commerce during the administrative review and submitted a case brief after Commerce published the Preliminary Results.

Plaintiff admitted that it failed to provide the responses to the Q&V questionnaire because: (i) Plaintiff's counsel had "forgotten that an administrative review request had even been filed," (ii) the attorney responsible for filing and monitoring the administrative review request left the firm representing Plaintiff, (iii) Plaintiff's counsel did not recall seeing an email from Commerce notifying the interested parties of the resumption of the review, and (iv) Plaintiff's personnel misfiled the electronic filings in the review proceedings. See BMW's Case

Brief at 5–7.  Plaintiff's omissions are notable because Plaintiff itself submitted a request for the administrative review in May 2011 and "[e]very other respondent in this review responded to the Q&V questionnaire."  I&D Memo at 12.  Plaintiff's failure to monitor the status of the litigation that led to the revocation of the very order that Plaintiff requested to be reviewed further supports Commerce's conclusion that Plaintiff failed to act to the best of its ability.  See id. at 9–13.  Based on these factors, the court finds that Commerce's AFA determination was supported by substantial evidence.

### III. AFA Rate

Plaintiff argues that Commerce's application of the 254.25 percent petition rate as the AFA rate was not supported by substantial evidence.  See Pl.'s Mem. Supp. 27–33.

When Commerce applies AFA, it may use information from the petition, a final determination in the investigation, any previous review, or any other information on the record.  See 19 U.S.C. § 1677e(b).  When the Department relies on secondary information,[5] such as the petition, "rather than on information obtained in the course of an investigation or review, [Commerce] shall, to the extent practicable, corroborate that information from independent sources that are reasonably at their disposal."  19 U.S.C. § 1677e(c); see also Statement of Administrative Action Accompanying Uruguay Round Agreements Act, H.R. Doc. 103-316, 870

---

[5] "Secondary information is information derived from the petition that gave rise to the investigation or review, the final determination concerning the subject merchandise or any previous review under [19 U.S.C. § 1675] concerning the subject merchandise."  Statement of Administrative Action Accompanying Uruguay Round Agreements Act, H.R. Doc. 103-316, at 870 (1994), reprinted in 1994 U.S.C.C.A.N. 4040, 4199 (1994).

(1994), reprinted in 1994 U.S.C.C.A.N. 4040, 4199 (1994) ("SAA").[6] The SAA defines "corroborate" to mean that Commerce will satisfy itself "that the secondary information to be used has probative value."  SAA at 870; see also 19 C.F.R. § 351.308.  As the Federal Circuit has made clear, the purpose of AFA is to "provide respondents with an incentive to cooperate, not to impose punitive, aberrational, or uncorroborated margins."  F.lli De Cecco Di Filippo Fara S. Martino S.p.A. v. United States, 216 F.3d 1027, 1032 (Fed. Cir. 2000).  The Department is obligated, therefore, to not only adequately corroborate a rate derived from a secondary source, but to ensure that rate is not punitive or aberrational.  See id.

Earlier decisions from the Court of Appeals for the Federal Circuit indicated that Congress intended the corroboration requirement to impose an obligation on Commerce that an AFA rate be a "reasonably accurate estimate of the respondents' actual rate, albeit with some built-in increase intended as a deterrent to non-compliance."  Id.  Subsequently, the court found that "[a]lthough Commerce has discretion in choosing from a list of secondary information to support its adverse inferences, Commerce must select secondary information that has some grounding in commercial reality."  Gallant Ocean (Thail) Co. v. United States, 602 F.3d 1319, 1324 (Fed. Cir. 2010).  In a recent decision, the court sought to clarify Commerce's obligations by noting that although "commercial reality" and "accurate" are "reliable guideposts for Commerce's determinations, [t]hose terms must be considered against what the antidumping

---

[6] Congress recently amended this subsection of 19 U.S.C. § 1677e relating to the corroboration of secondary information.  See Trade Preferences Extension Act of 2015, Pub. L. No. 114-27, 129 Stat. 362 (2015).  That amendment does not apply in this case because the amendment was not retroactive and took effect on June 29, 2015, after Commerce made its determination in this case.  See Ad Hoc Shrimp Trade Action Comm. v. United States, 802 F.3d 1339, 1352 (Fed. Cir. 2015).

statutory scheme demands." Nan Ya Plastics Corp. v. United States, 810 F.3d 1333, 1343 (Fed. Cir. 2016). The Nan Ya court explained that the "case law and the statute thus teach that a Commerce determination (1) is 'accurate' if it is correct as a mathematical and factual matter, thus supported by substantial evidence; and (2) reflects 'commercial reality' if it is consistent with the method provided in the statute, thus in accordance with law." Id. at 1344. This clarification was not rendered, however, by an *en banc* review, was discussed in dicta, and did not overrule any earlier decisions. See id. While the Nan Ya court clarified certain aspects Commerce's analysis regarding secondary information, the court is still bound to ensure that any determinations regarding rate selection are supported with substantial evidence and consistent with controlling precedent.

The selection of a high rate based on secondary information, even one significantly higher than the final calculated margins, can withstand judicial scrutiny if Commerce is able to appropriately corroborate that rate. See KYD, Inc. v. United States, 607 F.3d 760, 765 (Fed. Cir. 2010); Gallant Ocean, 602 F.3d at 1323–24. If Commerce's corroboration is not supported by substantial evidence, however, then the court cannot sustain the AFA rate. Such a situation exists here.

Commerce selected the petition rate of 254.25 percent to apply as the AFA rate against Plaintiff. See I&D Memo at 13–15. The petition was originally filed with the Department on March 31, 1988. See Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From the United Kingdom, 53 Fed. Reg. 15,081, 15,081 (Dep't Commerce Apr. 27, 1988) (initiation of antidumping duty investigation) (referring to the date the petition was filed). Although the statute grants Commerce the authority to select a petition rate as an AFA rate, the

statute further requires the Department to corroborate the use of such a rate, as it is derived from a secondary source. See 19 U.S.C. § 1677e(b)–(c). The SAA notes the importance of appropriate corroboration as "secondary information may not be entirely reliable because, for example, as in the case of the petition, it is based on unverified allegations . . . ." SAA at 870. Corroboration, as discussed above, requires Commerce to determine that there is evidence that the secondary source rate has probative value. See 19 U.S.C. § 1677e(b)–(c); SAA at 870. The petition rate used by Commerce here highlights the need for corroboration. Although the petition alleged dumping at 254.25 percent, the two individually investigated parties received rates of 61.14 percent and 44.02 percent, respectively, while the all others rate was calculated at 54.27 percent. See Order. Commerce considered the transaction specific margins it calculated for the mandatory respondent, NSK, and decided that the petition rate had been corroborated because (1) the petition rate fell within the range of transaction specific margins, and (2) the petition rate was below the [[    ]] top transaction specific margins calculated for NSK, which were both [[    ]] percent. See I&D Memo at 15.

      Commerce's explanation failed to adequately corroborate the petition rate and therefore the application of the 254.25 percent rate was unsupported by substantial evidence. First, Commerce failed to explain how the fact that the petition rate was numerically between the [[                    ]] transaction-specific rates calculated for the mandatory respondent was sufficient data to adequately corroborate the use of the 254.25 percent rate against Plaintiff. Second, the Department did not adequately explain why the mere fact that NSK "had transaction-specific dumping margins in excess of 254.25 percent," I&D Memo at 15, was sufficient to corroborate the probative value of the petition rate given that there were only [[    ]]

rates calculated to be greater than the petition rate, which accounted for [[            ]] of the NSK's total transactions for the review period.  See Preliminary Calculation Memorandum at 189, CD 36, bar code 3229548-01 (Sept. 19, 2014).  While NSK's top transaction-specific rates were calculated at [[      ]] percent, the record demonstrates that those rates are aberrational given that the Department reviewed [[     ]] transactions during the review period and the final weighted margin was calculated to be a mere 1.43 percent.  See Final Results, 80 Fed. Reg. at 9,695.

      In the past, the use of a small number of transaction-specific margins has sufficiently corroborated an AFA rate when such data was obtained from the non-cooperating party.  See Papierfabrik August Koehler Se v. United States, 843 F.3d 1373, 1380–82 (Fed. Cir. 2016); PAM S.P.A. v. United States, 582 F. 3d 1336, 1340 (Fed. Cir. 2009); Ta Chen Stainless Steel Pipe, Inc. v. United States, 298 F. 3d 1330, 1339 (Fed. Cir. 2002).  In this case, however, the Department's corroboration relied solely on a small number of aberrational, transaction-specific margins calculated using data obtained from the mandatory respondent.  See, e.g., Gallant, 602 F.3d at 1324.  The absence of information pertaining to the non-cooperating party does not excuse Commerce from its obligation to corroborate the AFA rate.  Also, the record appears to be devoid of any discernable explanation as to how NSK's aberrational, transaction-specific margins corroborate the AFA rate assigned to Plaintiff.  The court questions whether Commerce could corroborate a rate from a nearly 30-year-old petition when it is evident from NSK's transaction specific margins and the ultimate weighted margin that a 254.25 percent dumping margin has very little connection, if any, to BMW.

Commerce failed to corroborate the selected rate, rendering the AFA rate unsupported by substantial evidence and inconsistent with Federal Circuit decisions.  The court finds that the AFA rate selected by Commerce and assigned to Plaintiff is not supported by substantial evidence.

## CONCLUSION

For the reasons set forth above, the court holds that (1) Commerce's resumption of the administrative review was in accordance with the law, (2) Commerce's decision to apply AFA was supported by substantial evidence, and (3) the AFA rate selected by Commerce was not supported by substantial evidence.  Therefore, in accordance with the foregoing, it is hereby

**ORDERED** that Commerce's decision to resume the administrative review following the reinstatement of the antidumping order is sustained; and it is further

**ORDERED** that Commerce's decision to apply an adverse inference in selecting from facts otherwise available is sustained; and it is further

**ORDERED** that this matter is remanded for Commerce to either (1) provide a new corroboration analysis for the selected petition rate that is consistent with the agency's obligations and this opinion or (2) determine a new AFA rate consistent with the agency's obligations and this opinion; and it is further

**ORDERED** that Commerce shall file its remand determination with the court on or before April 14, 2017; and it is further

**ORDERED** that the Parties shall file comments on the remand determination on or before May 12, 2017; and it further

**ORDERED** that the Parties shall file any replies to the comments on or before May 26, 2017.


Dated: March 2, 2017                                    /s/ Jennifer Choe-Groves
      New York, New York                          Jennifer Choe-Groves, Judge