Slip Op. 20-41

## UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| **BMW OF NORTH AMERICA LLC,**<br><br>    **Plaintiff,**<br><br>v.<br><br>**UNITED STATES,**<br><br>    **Defendant.** | **Before: Jennifer Choe-Groves, Judge**<br><br>**Court No. 15-00052** |

## <u>OPINION</u>

[Sustaining the U.S. Department of Commerce's second remand redetermination in the 2010–2011 administrative review of the antidumping duty order on ball bearings and parts thereof from the United Kingdom.]

Dated: March 26, 2020

<u>Max F. Schutzman</u>, <u>Ned H. Marshak</u>, and <u>Kavita Mohan</u>, Grunfeld Desiderio Lebowitz Silverman & Klestadt LLP, of New York, N.Y. and Washington, D.C., for Plaintiff BMW of North America LLC.  <u>Andrew T. Schutz</u> and <u>Jordan C. Kahn</u> also appeared.

<u>Tara K. Hogan</u>, Assistant Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., for Defendant United States.  With her on the brief were <u>Joseph H. Hunt</u>, Assistant Attorney General, and <u>Jeanne E. Davidson</u>, Director.  Of counsel on the brief was <u>Mykhaylo A. Gryzlov</u>, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, D.C.  <u>Alexander O. Canizares</u> and <u>Jessica M. Link</u> also appeared.

Choe-Groves, Judge: BMW of North America LLC ("BMW" or "Plaintiff") brought this

action challenging the final determination in the 2010–2011 administrative review of the

antidumping duty order on ball bearings and parts thereof from the United Kingdom.  <u>See</u> <u>Ball</u>

<u>Bearings and Parts Thereof From Japan and the United Kingdom</u>, 80 Fed. Reg. 4248 (Dep't

Commerce Jan. 27, 2015) (final results of 2010–2011 administrative review), <u>as amended</u>, 80

Fed. Reg. 9694 (Dep't Commerce Feb. 24, 2015) (amended final results of 2010–2011

administrative review) (collectively, "<u>Final Results</u>").  Before the court are the Final Results of

Remand Redetermination, ECF No. 113 ("<u>Second Remand Results</u>"), filed by the U.S.

Department of Commerce ("Commerce") pursuant to the court's second remand order, ECF No.

103 ("Second Remand Order"), following the U.S. Court of Appeals for the Federal Circuit's

decision in <u>BMW of North America LLC v. United States</u>, 926 F.3d 1291 (Fed. Cir. 2019).  For

the following reasons, the court sustains the <u>Second Remand Results</u>.

## I.    BACKGROUND

The court presumes familiarity with the facts and procedural history set forth in its prior

opinions and recounts the facts relevant to the court's review of the <u>Second Remand Results</u>.

<u>See</u> <u>BMW of N. Am. LLC v. United States</u>, 41 CIT __, 255 F. Supp. 3d 1342 (2017), <u>vacated</u>,

926 F.3d 1291 (Fed. Cir. 2019), and <u>BMW of N. Am. LLC v. United States</u>, 41 CIT __, 208 F.

Supp. 3d 1388 (2017).

In 1989, Commerce issued an antidumping duty order on ball bearings from the United

Kingdom.  <u>See</u> <u>Antidumping Duty Orders and Amendments to the Final Determinations of Sales</u>

<u>at Less Than Fair Value: Ball Bearings, and Cylindrical Roller Bearings and Parts Thereof From</u>

<u>the United Kingdom</u>, 54 Fed. Reg. 20,910 (Dep't Commerce May 15, 1989) ("Order").

Commerce assigned weighted-average margins of 61.14% and 44.02% to the two cooperating

respondents and 54.27% to all other exporters.  <u>Id.</u>  In 2011, Commerce revoked the Order and

discontinued the 2010–2011 administrative review, in response to challenges to the International

Trade Commission's determination in the second sunset review of the Order.  <u>See</u> <u>NSK Corp. v.</u>

<u>United States</u>, 35 CIT 432, 774 F. Supp. 2d 1296 (2011); <u>Ball Bearings and Parts Thereof From</u>

<u>Japan and the United Kingdom: Revocation of Antidumping Duty Orders</u>, 76 Fed. Reg. 41,761

(Dep't Commerce July 15, 2011).  After the ruling in <u>NSK Corp. v. U.S. International Trade</u>

<u>Commission</u>, 716 F.3d 1352 (Fed. Cir. 2013), Commerce reinstated the Order and resumed the

2010–2011 administrative review.  <u>Ball Bearings and Parts Thereof From Japan and the United</u>

<u>Kingdom: Notice of Reinstatement of Antidumping Duty Orders, Resumption of Administrative</u>

<u>Reviews, and Advance Notification of Sunset Reviews</u>, 78 Fed. Reg. 76,104, 76,104 (Dep't

Commerce Dec. 16, 2013).  To effectuate the reinstatement, Commerce notified all respondents'

counsel of a forthcoming quantity and value ("Q&V") questionnaire, published a corresponding

notice in the Federal Register, and emailed the questionnaire to all interested parties.  <u>Id.</u> at

76,105–06; U.S. Department of Commerce Memo to File Regarding E-mail Sent to BMW's

Counsel Forwarding the Quantity and Value Questionnaire, PD 65 (Dec. 12, 2013); U.S.

Department of Commerce Letter to Interested Parties Granting Extension of Time to File

Quantity and Value Questionnaire Responses, PD 9 (Dec. 20, 2013).  Counsel for BMW asserted

that he "did not see and/or receive that email."  Compl. ¶ 13, ECF No. 7.  BMW did not return

the Q&V questionnaire, withdraw its request for a review, or otherwise cooperate.  <u>See</u> USDOC:

Decision Memorandum for Preliminary Results of Antidumping Duty Administrative Reviews:

Ball Bearings and Parts Thereof From Japan and the United Kingdom, PD 64, at 6 (Sept. 17,

2014).  Commerce selected NSK Europe Ltd. and NSK Bearings Europe Ltd. (collectively,

"NSK") as the sole mandatory respondent.  <u>See</u> <u>Ball Bearings and Parts Thereof From Japan and</u>

<u>the United Kingdom: Preliminary Results of Antidumping Duty Administrative Review; 2010–</u>

<u>2011</u>, 79 Fed. Reg. 56,771, 56,772 (Dep't Commerce Sept. 23, 2014).

     In the <u>Final Results</u> issued on January 21, 2015, Commerce determined that BMW had

not cooperated to the best of its ability, applied an adverse inference against BMW in selecting

from facts otherwise available ("AFA"), and assigned BMW a dumping margin of 254.25%.

Issues and Decision Memorandum for the Antidumping Duty Administrative Review of Ball

Bearings and Parts Thereof from the United Kingdom; 2010–2011, PD 81 (Jan. 21, 2015) ("I&D

Memorandum"), see Final Results at 4248, as amended, 80 Fed. Reg. at 9694.  Commerce

assigned all other exporters a rate of 1.55%, which was amended to 1.43%.  Id.  The court upheld

Commerce's determination to resume the administrative review and to apply AFA against

BMW, but rejected the rate for lack of substantial evidence and remanded to Commerce for a

different analysis or redetermination of the AFA rate.  BMW of N. Am. LLC, 208 F. Supp. 3d at

1398.  In the first remand order, the court sustained Commerce's revised AFA rate of 126.44%

based on a transaction-specific margin calculated for the mandatory respondent, NSK.  See

BMW of N. Am. LLC, 255 F. Supp. 3d at 1346–47.  On appeal, the U.S. Court of Appeals for

the Federal Circuit affirmed the court's approval of the resumption of the 2010–2011

administrative review and Commerce's decision to apply AFA for BMW's failure to cooperate,

but vacated the court's order and remanded for consideration of whether the AFA rate was

unduly punitive in light of BMW's level of culpability and the "procedural irregularities" of

resuming a discontinued review.  BMW of N. Am. LLC, 926 F.3d at 1302.  The court remanded

to Commerce for reconsideration.  Second Remand Order.

     In the Second Remand Results, Commerce applied the Trade Preferences Extension Act

of 2015 ("TPEA") and assigned an AFA rate of 61.14%.  Second Remand Results at 13.

Plaintiff opposes Commerce's application of the TPEA and the 61.14% rate.  See Pl.'s

Comments, ECF Nos. 115, 116.

## II.   JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction under 19 U.S.C. § 1516a(a)(2)(B)(iii) and 28 U.S.C. § 1581(c). The court will uphold Commerce's determination unless it is unsupported by substantial evidence on the record, or otherwise not in accordance with the law.  19 U.S.C. § 1516a(b)(1)(B)(i).

## III.   DISCUSSION

BMW challenges the Second Remand Results on the grounds that (1) Commerce applied the TPEA impermissibly and (2) the AFA rate of 61.14% is unlawfully punitive, unsupported by substantial evidence, and inconsistent with the mandate of the U.S. Court of Appeals for the Federal Circuit.  See Pl.'s Comments at 7–24.

### A.   The TPEA Does Not Apply to Pre-Enactment Conduct

Plaintiff avers that the TPEA does not apply retroactively because the issue of the AFA rate is an ongoing challenge stemming from the 2010–2011 administrative review that predates the TPEA's entry into force.  Id. at 5–10.  The court agrees and concludes that the TPEA does not apply retroactively to this remand determination.

Commerce issued the Final Results before the TPEA was enacted.  See I&D Memorandum.  In the first remand, Commerce applied the TPEA and BMW disagreed, but neither this court nor the U.S. Court of Appeals for the Federal Circuit reached the issue of the TPEA's applicability because Commerce used primary information that does not require corroboration either pre-TPEA or after enactment of the TPEA.  BMW of N. Am. LLC, 926 F.3d at 1301 n.3; BMW of N. Am. LLC, 255 F. Supp. 3d at 1346 n.4.  In the second remand, Commerce again applied the TPEA, arguing that the reduction of the AFA rate to 61.14% in the

second remand was a new determination subject to the TPEA.  Second Remand Results at 7–8,

14–15; Def.'s Reply 7–12, ECF No. 117.  The 61.14% rate is based on secondary information,

which requires different standards of corroboration depending on whether the TPEA applies.

When Commerce "finds that an interested party has failed to cooperate by not acting to

the best of its ability to comply with a request for information," Commerce "may use an

inference that is adverse to the interests of that party in selecting from among the facts otherwise

available."  19 U.S.C. § 1677e(b)(1)(A).  Commerce may use information from the petition, a

final determination in the investigation, any previous review, or any other information on the

record when selecting an AFA rate.  See id. § 1677e(b)(2).  Commerce need not corroborate the

use of information on the record that was obtained during the instant segment of the proceeding

(i.e., primary information).  See id. § 1677e(c).  However, "[w]hen [Commerce] relies on

secondary information[1] rather than on information obtained in the course of an investigation or

review, [Commerce] shall, to the extent practicable, corroborate that information from

independent sources that are reasonably at [its] disposal . . . ."  Id.

President Obama signed the TPEA into law on June 29, 2015.  Section 502, amending 19

U.S.C. § 1677e, relaxes the corroboration requirement when Commerce assigns an AFA rate to

an uncooperative respondent based on secondary information.  Ad Hoc Shrimp Trade Action

Comm. v. United States, 802 F.3d 1339, 1348 (Fed. Cir. 2015).  The TPEA amended the

corroboration of secondary information in 19 U.S.C. § 1677e as follows: "The administrative

---

[1] Commerce's regulations reflect that information from the petition, a final determination in the
investigation, or any previous review constitutes secondary information.  See 19 C.F.R.
§§ 351.308(c)(1)–(2) & (d).

authority . . . shall not be required to corroborate any dumping margin . . . applied in a separate segment of the same proceeding . . . ."

When considering the retroactive application of a federal statute, a court conducts a two-step analysis.  First, the court must "determine whether Congress has expressly prescribed the statute's proper reach."  Landgraf v. USI Film Prods., 511 U.S. 244, 280 (1994).  If the plain language resolves this issue, then the court applies the statute because "there is no need to resort to judicial default rules" of interpretation.  Id.  When "the statute contains no such express command," the court looks at whether the legislation would have "retroactive effect."  Id.  A statute would operate retroactively when it "would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed."  Id.  "[R]etroactivity is a matter on which judges tend to have sound . . . instinct[s] and familiar considerations of fair notice, reasonable reliance, and settled expectations offer sound guidance."  Id. at 270 (internal citations and quotation marks omitted).  Absent clear expression of congressional intent, the Landgraf presumption against retroactive application controls and the court will not apply the statute to pre-enactment conduct.

In this case, the TPEA language and legislative history are silent as to its effective date.  Commerce issued an interpretive rule explaining that Commerce applies the TPEA to all determinations made on or after August 6, 2015.  Dates of Application of Amendments to the Antidumping and Countervailing Duty Laws Made by the Trade Preferences Extension Act of 2015, 80 Fed. Reg. 46,793, 46,794 (Aug. 6, 2015) ("Interpretive Rule").  The U.S. Court of Appeals for the Federal Circuit has held that the TPEA applies prospectively, but has not addressed whether the TPEA's lower corroboration standard applies to post-TPEA remand

determinations of pre-TPEA final determinations.  Ad Hoc Shrimp Trade Action Comm., 802

F.3d at 1352; see Tai Shan City Kam Kiu Aluminum Extrusion Co., Ltd. v. United States, 39

CIT __, 125 F. Supp. 3d 1337, 1342 n.5 (2015).  Courts in the Federal Circuit have concluded

that the TPEA does not apply to "remand determinations . . . where the Commerce determination

that is being litigated predates the new TPEA standard."  Shenzhen Xinboda Indus. Co. v. United

States, 43 CIT __, 361 F. Supp. 3d 1337, 1359–60 (2019) (citing Fresh Garlic Producers Ass'n v.

United States, 121 F. Supp. 3d 1313, 1328–33 (2015) ("FGPA")).  In FGPA, the Court analyzed

the application of the TPEA to remand determinations and concluded that the TPEA did not

apply.  FGPA, 121 F. Supp. 3d at 1332.  The Court was not persuaded by Commerce's

arguments that the conduct regulated by the TPEA was Commerce's conduct, that applying the

TPEA to "new" remand determinations did not constitute retroactive application, and that "trade

remedy laws are . . . inherently retroactive."  Id. at 1331.  The Court reasoned that, for evaluating

the retroactive application of the TPEA, the controlling date was when Commerce assigned total

AFA for a respondent's failure to cooperate to the best of its ability because that was the decision

that affected the uncooperating respondent's rights.  Id. at 1332.  There, the Court concluded that

the TPEA did not apply because the date on which Commerce assigned total AFA was before the

TPEA's date of enactment.  Id. at 1333.

Without distinguishing the FGPA line of cases and raising many of the same arguments

as in FGPA, Commerce asks this court to reach the opposite conclusion.  Def.'s Reply at 12.

Commerce argues that because the TPEA does not "regulate primary conduct," but rather

governs Commerce's decision-making, it is appropriate for Commerce to apply the TPEA to

post-TPEA determinations.  Id. at 10.  Commerce asserts that the controlling date here is October

1, 2019, when Commerce decided "to select a rate based on secondary information."  Id.

      The court concludes that the TPEA does not apply to remand determinations of

administrative reviews where the decision to apply AFA predated the TPEA's enactment.  As to

the Interpretive Rule regarding the TPEA, a remand determination is not a new determination.

The administrative record on which Commerce's remand determination is based was compiled

pre-TPEA.  See Pl.'s Comments at 9–10.  The controlling date in this case is January 21, 2015,

when Commerce published the Final Results and announced its decision to apply AFA for

BMW's failure to cooperate to the best of its ability.  The publication date of the Final Results

applying AFA is the date of the decision that affected the uncooperating respondent's rights.  In

addition, a remand determination only occurs if there is some defect in the final determination

that must be remedied before the determination can stand.  See FGPA, 121 F. Supp. 3d at 1332

("To apply § 502 on remand would be in effect to apply the law retroactively by applying it to a

determination that occurred before the new law became effective.").

      The Landgraf analysis also opposes application of the TPEA to remand determinations.

Because Congress has not provided an effective date, the court looks to the retroactive effect.

See Landgraf, 511 U.S. at 280.  Altering the corroboration requirement mid-litigation has the

potential to "increase a party's liability for past conduct."  See id.  It is clear that "[applying the

TPEA] would [] serve to treat parties differently merely because Commerce made an error in one

case and not in another decided at the same time."  FGPA, 121 F. Supp. 3d at 1332.  "[F]amiliar

considerations of fair notice, reasonable reliance, and settled expectations" favor the use of a

consistent corroboration standard through each remand redetermination such that a plaintiff

understands Commerce's discretion and requirements in selecting an AFA rate.  See Landgraf,

511 U.S. at 270.  Accordingly, the court holds that the TPEA does not apply to remand

determinations of pre-enactment final results.  The court concludes that Commerce erred by

applying the TPEA to the AFA rate selected in the second remand redetermination for BMW.

As discussed below, however, the court can continue to a pre-TPEA analysis in this case

because, despite arguing that Commerce did not need to corroborate the selection of the AFA

rate under the TPEA, Commerce nonetheless provided its corroboration analysis and reasons

why the AFA rate was appropriate here.  The court will proceed to analyze whether the AFA rate

is supported by substantial evidence and in accordance with the pre-TPEA law.

### B.  The AFA Rate is Supported by Substantial Evidence and in Accordance with the Law

The U.S. Court of Appeals for the Federal Circuit directed Commerce to consider

whether the AFA rate of 126.44% was unduly punitive relative to the procedural anomaly

preceding BMW's failure to cooperate.  BMW of N. Am. LLC, 926 F.3d at 1302.  BMW argues

that Commerce did not consider BMW's level of culpability, i.e., that its failure to cooperate was

due to the attorney's "mistake," as opposed to "a deliberate decision not to cooperate with

Commerce or to intentionally submit false information."  Pl.'s Comments at 21.  BMW asserts

that any rate over 54.27%—BMW's cash deposit rate and the all-others rate calculated in 1989—

is punitive and that Commerce failed to justify the 61.14% rate.  Specifically, BMW contends

that Commerce failed to explain how a rate forty times higher than the 1.43% rate assigned to all

other respondents in the Final Results is nonpunitive.  Id. at 14.

The court finds that Commerce complied with the mandate of the U.S. Court of Appeals for the Federal Circuit.  Second Remand Results at 9–13 (citing BMW of N. Am. LLC, 926 F.3d at 1302 ("Our case law establishes that Commerce must consider the totality of the circumstances in selecting an AFA rate, including, if relevant, the seriousness of the conduct of the uncooperative party.")).  In its analysis of the totality of circumstances, Commerce acknowledged the unusual procedure here in discontinuing and resuming the administrative review.  Id. at 11–12.  Commerce recounted that, to effectuate the resumption, Commerce emailed the Q&V questionnaire to counsel for all respondents and published a notice in the Federal Register.  Id. at 10.  Commerce fulfilled its duty to notify the public about the resumption of the administrative review when it published the notice in the Federal Register and directly emailed all attorneys of record (including BMW's attorney, who said that he made a "mistake" and was not aware of the resumption of the administrative review).  It was reasonable to expect that BMW should have been on notice of the resumption of the administrative review and should have cooperated, as indicated both by the publication of the notice in the Federal Register and the direct notification to its attorney of record.  Commerce considered the fact that BMW did not complete the questionnaire, withdraw from review, or participate in any way when it evaluated BMW's culpability.  Id.  Upon consideration of the totality of circumstances, Commerce reduced the AFA rate in the second remand from 126.44% to 61.14%.[2]  Id. at 12–13.

---

[2] BMW responds that "Commerce seems to believe that the mere fact it has selected a rate lower than 126.44 is sufficient to demonstrate the rate is not punitive."  Pl.'s Comments at 14.  The court notes that Commerce did not reduce the rate by one or two percentage points, but rather by more than half, given no other instruction than to consider BMW's level of culpability.

Commerce bases the 61.14% AFA rate on secondary information.  Def.'s Reply at 11.

As noted above, Commerce applied the TPEA and asserted that the new AFA rate based on

secondary information does not need to be corroborated under the new TPEA standard.

Notwithstanding this assertion, Commerce argued in the alternative assuming that the court

might find that the pre-TPEA law applied, and Commerce provided a corroborating analysis in

its <u>Second Remand Results</u> when it selected the new rate of 61.14%.  <u>Second Remand Results</u> at

25–27; Def.'s Reply at 12 ("Even assuming that the pre-TPEA requirements applied to this

remand proceeding, this [c]ourt should affirm the remand redetermination because Commerce

provided the requisite factual analysis needed for this [c]ourt to confirm that the rate has

probative value.").  Because Commerce provided its corroborating analysis in the <u>Second</u>

<u>Remand Results</u> as an alternative argument, the court will consider whether Commerce

corroborated the new rate properly under the pre-TPEA framework.

Commerce selected 61.14% because it is equivalent to the higher of the dumping margins

calculated for the two cooperating respondents in 1989, 61.14% and 44.12%.  <u>See</u> <u>Second</u>

<u>Remand Results</u> at 13; Pl.'s Comments at 28 (citing Final Determinations of Sales at Less Than

Fair Value; Antifriction Bearings (Other Than Spherical Plain Bearings and Tapered Roller

Bearings) and Parts Thereof From the United Kingdom; and Final Determination of Sales at Not

Less Than Fair Value: Spherical Plain Bearings Parts Thereof From the United Kingdom, 54

Fed. Reg. 19,120, 19,120–21 (May 3, 1989)).  Further, Commerce selected the 61.14% rate

because: 1) the rate is higher than the all-others rate of 54.27% previously applied to BMW;

2) the rate is not punitive because it was calculated for a cooperating respondent in this

proceeding; and 3) the rate was previously applied as AFA with requisite corroboration.  <u>Second</u>

Remand Results at 13.  BMW contends that the 61.14% rate is unsupported by substantial

evidence and is unduly punitive.  See Pl.'s Comments at 14.

In the pre-TPEA framework applied by the court here, Commerce must independently

corroborate the use of secondary information.[3]  19 U.S.C. § 1677e(c); see also Statement of

Administrative Action Accompanying Uruguay Round Agreements Act, H.R. Doc. 103-316, 870

(1994), reprinted in 1994 U.S.C.C.A.N. 4040, 4199 (1994) ("SAA").  "Corroborate" means that

Commerce will satisfy itself "that the secondary information to be used has probative value."

SAA at 870; see also 19 C.F.R. § 351.308.  The SAA notes the importance of appropriate

corroboration as "secondary information may not be entirely reliable because, for example, as in

the case of the petition, it is based on unverified allegations."  SAA at 870.  In addition, the

purpose of AFA is to "provide respondents with an incentive to cooperate, not to impose

punitive, aberrational, or uncorroborated margins."  F.lli De Cecco Di Filippo Fara S. Martino

S.p.A. v. United States, 216 F.3d 1027, 1032 (Fed. Cir. 2000).  Therefore, in a pre-TPEA case,

Commerce must adequately corroborate a rate derived from a secondary source and ensure that

the rate is not punitive or aberrational.  See id.  The balance between incentive and punishment

"will depend upon the facts in a particular case."  BMW of N. Am. LLC, 926 F.3d at 1301

(quoting Nan Ya Plastics Corp. v. United States, 810 F.3d 1333, 1347 (Fed. Cir. 2016)).

---

[3] "Secondary information is information derived from the petition that gave rise to the
investigation or review, the final determination concerning the subject merchandise or any
previous review under [19 U.S.C. § 1675] concerning the subject merchandise."  Statement of
Administrative Action Accompanying Uruguay Round Agreements Act, H.R. Doc. 103-316, at
870 (1994), reprinted in 1994 U.S.C.C.A.N. 4040, 4199 (1994).

The corroboration requirement constrains Commerce to select an AFA rate that is a "reasonably accurate estimate of the respondent's actual rate, albeit with some built-in increase intended as a deterrent to non-compliance." F.lli De Cecco Di Filippo Fara S. Martino S.p.A., 216 F.3d at 1032.  Thus, Commerce may select an AFA rate that denies a noncooperating respondent "a more favorable result by failing to cooperate than if it had cooperated fully."  SAA at 870.  The selection of a high rate based on secondary information, even one significantly higher than the final calculated margins, can withstand judicial scrutiny if Commerce is able to appropriately corroborate that rate.  See KYD, Inc. v. United States, 607 F.3d 760, 765 (Fed. Cir. 2010).

BMW contends that if it had cooperated, "the record clearly demonstrates that [BMW's] rate would have been 1.43 percent," Pl.'s Comments at 22, which was the weighted-average margin calculated for all respondents, id. at 17.  BMW argues for an AFA rate based on the commercially reasonable 1.43% rate, and asserts that an AFA rate should be no greater than double 1.43% to account for deterrence.  Id.  On appeal, BMW did not contest Commerce's application of AFA, which this court sustained.  Although a 1.43% margin may be one possible inference supported by the record, Commerce may draw an adverse inference as long as it is supported by substantial evidence, as it is here.

In selecting the AFA rate of 61.14%, Commerce chose the all-others rate applied to BMW of 54.27% as a starting point.  Second Remand Results at 18 ("Having never been subject to a review since the imposition of this order prior to the instant review, the weighted-average dumping margin applicable to BMW prior to this administrative review was the all-others rate, which is 54.27 percent.").  Commerce argues that assigning an AFA rate lower than 54.27%

would reduce the rate applied to BMW and would confer a benefit, despite BMW's noncooperation.  Id.  Although BMW argues that its counsel's "inadvertent mistake" involved a low level of culpability, the level of culpability does not change the fact that BMW failed to cooperate, leaving Commerce to select an AFA rate in the absence of BMW's information.

In the pre-TPEA framework, Commerce must corroborate the secondary information basis for the AFA rate.  Commerce selected an AFA rate of 61.14%, equivalent to the highest calculated antidumping margin for a cooperating respondent in this proceeding.[4]  Second Remand Results at 13.  As a margin calculated from a cooperating respondent's information, Commerce regarded the 61.14% rate as reliable.  See Def.'s Reply at 13.  When applied to the cooperating respondent, Commerce did not include a "built-in increase" or deterrence.  See id. Commerce considered that applied to BMW, 61.14% was marginally higher, 12.7%, than the 54.27% all-others rate previously applied to BMW, and the marginal increase was appropriate for deterrence.  See Second Remand Results at 18–19; Def.'s Reply at 13.  The court finds that 61.14% is not punitive or aberrational in light of the reasons provided by Commerce.  Based upon the totality of circumstances, the court concludes that the rate of 61.14% applied to BMW as an AFA rate is adequately corroborated under the applicable pre-TPEA framework.  In sum, the 61.14% AFA rate is supported by substantial evidence and is in accordance with the law.

---

[4] There were two calculated antidumping margins for cooperating respondents in this proceeding.  The other calculated rate was 44.02%.  Commerce did not select 44.02% as the AFA rate because a 44.02% rate would be lower than the all-others 54.27% rate and therefore not adverse.  See Second Remand Results at 18.

## IV.    CONCLUSION

For the foregoing reasons, the court sustains the AFA rate of 61.14%.

Judgment will be entered accordingly.

/s/ Jennifer Choe-Groves
Jennifer Choe-Groves, Judge

Dated:    March 26, 2020
         New York, New York